# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Synovus Bank, Appellant,

v.

South Carolina Department of Revenue, Respondent.

Appellate Case No. 2020-000999

---

Appeal From The Administrative Law Court
Ralph King Anderson, III, Administrative Law Judge

---

Opinion No. 6076
Heard February 13, 2024 – Filed July 31, 2024

---

### AFFIRMED

---

Ashley P. Cuttino and Lewis T. Smoak, both of Ogletree
Deakins Nash Smoak & Stewart, P.C., of Greenville, and
Burnet R. Maybank, III, of Adams and Reese LLP, of
Columbia, all for Appellant.

Jason P. Luther, of the South Carolina Department of
Revenue, for Respondent.

Rick Reames III, of Maynard Nexsen PC, of Columbia,
for Amicus Curiae First Citizens Bank & Trust
Company.

---

**HEWITT, J.:**  South Carolina annually imposes a tax on a bank's "entire net
income."  This case centers around the interpretation of that term.

Synovus Bank (Synovus) sought a ruling from the Administrative Law Court (ALC) permitting Synovus to apply a certain federal income tax deduction —a net operating loss carryforward—when calculating its state bank tax liability. The ALC held that the deduction was not allowed. Synovus appeals that ruling and further challenges the ALC's decision directing Synovus to use Generally Accepted Accounting Principles, commonly known as "GAAP," to calculate its bank tax liability.

We affirm the ALC's ruling—that a bank is not allowed to use the net operating loss carryforward when calculating its entire net income for state bank tax purposes—for three general reasons.

First, though we do not discern any ambiguity in the statutory scheme, we must still begin with the proper frame of reference. This case is about a tax deduction. Precedent establishes that any ambiguities in a tax deduction statute are construed against the taxpayer. Second, Synovus's argument that the statutory term entire net income necessarily includes the carryforward deduction is not supported by South Carolina's historical application of the state bank tax or by the long-established understanding that South Carolina's bank tax is a "franchise tax" and not an income tax. Third, Synovus's assertion that the General Assembly intended the bank tax to parallel and conform to the federal income tax regime is not faithful to the text of the relevant legislation. As for Synovus's argument relating to required accounting principles, we find that Synovus's own use of GAAP defeats its challenge to the ALC's decision requiring Synovus to use GAAP when calculating its bank tax liability.

**FACTS**

In 2010, National Bank of South Carolina and Columbus Bank and Trust merged. The merged company was renamed Synovus. At all relevant times, these entities operated as banks.

In 2009 and 2010, the combined entities reported roughly $390 million in losses to the South Carolina Department of Revenue (DOR) for bank tax purposes. The losses were adjusted after audit to roughly $480 million. Synovus filed its bank tax return for the 2011 tax year and then amended and refiled its return multiple times. The original and second amended returns reported that Synovus had a positive net income associated with its activities in South Carolina.

On its third amended return for the 2011 tax year, Synovus applied substantial losses from 2009 when calculating its entire net income. This adjustment resulted in Synovus reporting no bank tax liability for 2011.

In tax accounting, applying a net operating loss to a later tax year is called a "carryforward." The applicable section of the Internal Revenue Code provides:

> The entire amount of the net operating loss for any taxable year . . . shall be carried to the earliest of the taxable years to which . . . such loss may be carried. The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried.

26 U.S.C.A. § 172(b)(2) (West). As with the 2011 tax year, Synovus sought to apply unused losses from prior years on its 2012, 2013, and 2014 bank tax returns.

DOR initially granted Synovus refunds for each of those years but held the 2012 refund for verification. DOR then audited Synovus for tax years 2011–2014. DOR's audit revealed Synovus's application of the net operating loss carryforward and other deductions that DOR determined were improper. DOR disallowed the carryforward deduction and recalculated Synovus's bank tax liability.

Synovus filed a written protest and later filed a request for a contested case hearing. The parties eventually filed cross-motions for summary judgment.

The ALC partially granted DOR's motion for summary judgment and denied Synovus's motion. In a thorough order, the ALC found there was no statutory basis for applying the net operating loss carryforward to the state bank tax.

The ALC then held a contested case hearing to determine how to properly calculate the bank tax and to determine whether DOR improperly relied on GAAP when calculating Synovus's bank tax liability. The ALC's final order reiterated its prior ruling that disallowed the net operating loss carryforward and resolved additional issues from the hearing.

**STANDARD OF REVIEW**

The Administrative Procedures Act governs the court's review of the ALC's decisions. *Jack's Custom Cycles, Inc. v. S.C. Dep't of Revenue*, 439 S.C. 35, 41, 885 S.E.2d 433, 436 (Ct. App. 2023). The Act explains, "The court may not substitute its judgment for the judgment of the administrative law judge as to the weight of the evidence on questions of fact." S.C. Code Ann. § l-23-610(B) (2005 & Supp. 2023). As relevant here, the court may reverse the ALC's decision only if the decision is "affected by [an] error of law; . . . clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or . . . arbitrary or capricious or characterized by abuse of discretion . . . ." S.C. Code Ann. § 1-23-610(B)(d)-(f) (2005 & Supp. 2023).

## ANALYSIS

### Statutory Framework

We begin with the familiar principle that "[t]he cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature." *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000). We do not read statutes as though individual laws or collections of laws exist in a vacuum; instead, the court considers the entire statute when determining its meaning. *In re Hosp. Pricing Litig., King v. AnMed Health*, 377 S.C. 48, 59, 659 S.E.2d 131, 137 (2008) ("[I]n ascertaining the intent of the legislature, a court should not focus on any single section or provision but should consider the language of the statute as a whole."). When multiple sections belong to the "same general statutory scheme," those sections "must be construed together and each given effect[] if it can be done by any reasonable construction." *Hinton v. S.C. Dep't of Prob., Parole & Pardon Servs.*, 357 S.C. 327, 333, 592 S.E.2d 335, 338 (Ct. App. 2004).

Under South Carolina law, "[t]ax deductions are a matter of legislative grace and the taxpayer must establish compliance with the statutory conditions imposed." *Davis Mech. Contractors, Inc. v. Wasson*, 268 S.C. 26, 29, 231 S.E.2d 300, 301 (1977). "[E]ven if [a deduction] statute were [deemed] ambiguous[,] the court would be required to construe the same unfavorably to the taxpayer." *S. Soya Corp. of Cameron v. Wasson*, 252 S.C. 484, 489, 167 S.E.2d 311, 313 (1969); *id.* ("The rule generally applicable in the construction of income tax statutes that ambiguities are to be resolved in favor of the taxpayer does not apply in the construction of a statute authorizing deductions; rather, the ambiguity will be resolved against the taxpayer." (citation omitted)).

We begin our analysis of the statutory arguments with those principles in mind because there is no surer way to reach the wrong end than to start at the wrong beginning. On the merits, Synovus argues that the net operating loss carryforward is inherent in the term entire net income and that the legislature imported the net operating loss carryforward into the bank tax when it passed several "conformity statutes," adopting much of the Internal Revenue Code for purposes of South Carolina income tax law. Synovus further contends the bank tax is an income tax and thus it must be calculated based on taxable income. As explained below, we respectfully disagree with each of these contentions.

**Entire Net Income**

The General Assembly enacted the bank tax in 1937. The 1937 statute levied a 4.5% tax on "the entire net income of such bank . . . " in lieu of all other taxes, except property taxes. Code of Laws of S.C. § 65-402 (Supp. 1937). The bank tax adopted certain parts of the state corporate income tax code, but only for "administration, enforcement, collections, liens, penalties, and other provisions of enforcement . . . ." *Id*. At the time of the bank tax's enactment, and for several years thereafter, both the bank tax and the corporate income tax were based on entire net income. *See* Code of Laws of S.C. § 65-402 (Supp. 1937) (bank tax); *see also* Code of Laws of S.C. § 2676(2) (1942) (bank tax); Code of Laws of S.C. § 2440 (1942) (corporate income tax).

If entire net income inherently allowed taxpayers to use unallocated losses from previous tax years, then the General Assembly would not have needed to amend the corporate income tax to allow a net operating loss carryforward. But that is precisely what the General Assembly did in 1955 in order to allow a corporation to apply the net operating loss carryforward when calculating its taxable income. Code of Laws of S.C. § 65-259(13)(A) (Supp. 1955). It is instructive that when the General Assembly authorized the net operating loss carryforward in 1955, it did so only for new businesses. The statute provided, "[T]here shall be allowed as a deduction from the gross income a net operating loss carryover under the following rules," and defined "net operating loss" as "the excess of allowable deductions over gross income for the taxable year arising from the operation of such new business or industry." *Id*. Likewise, the current iteration of the net operating loss carryforward is only codified in the corporate income tax statutes. *See* S.C. Code Ann. § 12-6-1130(4)(a)-(d) (2014).

We agree with the ALC that the 1955 amendment demonstrates the concept of using operating losses from past tax years to reduce taxable income during the current tax

year is not inherent in the term entire net income. It is difficult to understand the net operating loss carryforward statute as anything other than the result of the General Assembly recognizing the need to specifically authorize the net operating loss carryforward as a new and separate corporate tax deduction because the General Assembly created this deduction eighteen years after it codified the bank tax and severed banks from the corporate income tax.

The idea that this deduction relies on statutory authorization, and therefore did not predate its authorizing statute, is bolstered by the statutory language explaining the deduction "shall be allowed," Code of Laws of S.C. § 65-259(13)(A) (Supp. 1955), and reflects the common law doctrine that tax deductions are "matter[s] of legislative grace," *Davis Mech. Contractors, Inc.*, 268 S.C. at 29, 231 S.E.2d at 301. Because "the Legislature is given plenary power in the matter of taxation, subject [only] to express constitutional limitation," *Clarke v. S.C. Pub. Serv. Auth.*, 177 S.C. 427, 444, 181 S.E. 481, 487 (1935) (citation omitted), it follows that the net operating loss carryforward deduction was not inherent in any statute that predated its authorizing statute, including the 1937 and 1942 versions of the bank tax.

**Incorporation by Bank Tax Statutes**

We previously noted that when the General Assembly enacted the bank tax in 1937, the General Assembly specified that corporate income tax statutes would apply to the bank tax for the purposes of "administration, enforcement, collections, liens, penalties, and other provisions of enforcement . . . ." Code of Laws of S.C. § 65-402 (Supp. 1937). This limited incorporation remains intact. S.C. Code Ann. § 12-11-40 (2014). As before, banks remain explicitly excluded from the corporate income tax. S.C. Code Ann. § 12-6-550(1) (2014).

We agree with the ALC that adopting corporate tax statutes for purposes of "administration, enforcement, collections, liens, penalties, and other provisions of enforcement" is not broad enough to incorporate the corporate income tax code for purposes of tax deductions or other modifications.

The clearest example of this can be seen by contrasting the bank tax with another statute that excludes certain other entities from the corporate income tax. Banks are excluded from the corporate income tax under section 12-6-550(1) of the South Carolina Code (2014). Other entities are also excluded from the corporate income tax under section 12-6-540 of the South Carolina Code (2014). Section 12-6-540 imposes its own income tax and explains "[t]he modifications provided in Article 9 of this chapter and the allocation and apportionment provisions provided in Article

17 of this chapter apply" to the tax imposed on that group of otherwise excluded entities, a group that does not include banks. *Id.* The net operating loss carryforward is a modification on taxable income found in Article 9 of the South Carolina Income Tax Act. *See* S.C. Code Ann. § 12-6-1130(4)(a)-(d) (2014).

The point is this: the language in section 12-6-540 is strong evidence that if the General Assembly intended to apply the substantive modifications found in Article 9 to the bank tax, it would have expressly done so. Section 12-6-540 specifically incorporates Article 9 of the South Carolina Income Tax Act, which contains the net operating loss carryforward, and specifically references modifying the tax it imposes on certain excluded entities. Conversely, and critically, the bank tax's "incorporation" statute does neither of those things. *See* S.C. Code Ann. § 12-11-40 (2014). In addition, section 12-6-550 not only expressly excludes banks from taxes imposed under section 12-6-530 but also expressly excludes banks from taxation under section 12-6-540. S.C. Code Ann. § 12-6-550 (2014). If the General Assembly meant to apply corporate tax modifications from Article 9 to the bank tax, it could have easily done so like it did in section 12-6-540. *See Consumer Advoc. for State v. S.C. Dep't of Ins.*, 397 S.C. 599, 602, 725 S.E.2d 708, 710 (Ct. App. 2012) ("The court has no right to add the words [the legislature] omitted, nor to interpolate them on conceits of symmetry and policy." (alteration in original) (quoting *Kinard v. Moore,* 220 S.C. 376, 388, 68 S.E.2d 321, 325 (1951))). This court sits as an "interpreter[,] not legislator[]" and it is not within our power to override the legislature by incorporating modifications to the bank tax when the legislature has authorized no such action. *Bentley v. Spartanburg Cnty.*, 398 S.C. 418, 426, 730 S.E.2d 296, 301 (2012); *see also Hodges*, 341 S.C. at 85, 533 S.E.2d at 581 ("What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will. Therefore, the courts are bound to give effect to the expressed intent of the legislature." (quoting Norman J. Singer, *Sutherland Statutory Construction* § 46.03 at 94 (5th ed. 1992))).

**Accepted Practice that the Bank Tax is a Franchise Tax**

The chapter imposing the bank tax is, and has always been, titled "Income Tax on Banks." *See* S.C. Code Ann. §§ 12-11-10 to -60 (2014). Synovus points to this title, and to the fact that for several years the bank tax and the corporate income tax both relied on entire net income, to argue that the same rules for corporate income taxes apply to the bank tax.

Though courts may consider statutory titles when ascertaining the intent of the legislature, *Beaufort Cnty. v. S.C. State Election Comm'n*, 395 S.C. 366, 373 n.2,

718 S.E.2d 432, 436 n.2 (2011), statutes must still be read as a whole. *Id.* at 371, 718 S.E.2d at 435 ("[A] statute shall not be construed by concentrating on an isolated phrase."). If a statute lends itself to "uncertainty as to legislative intent[,] . . . the construing court [may] 'search for that intent beyond the borders of the act itself.'" *Smith v. Tiffany*, 419 S.C. 548, 556, 799 S.E.2d 479, 483 (2017) (quoting *Kennedy v. S.C. Ret. Sys.*, 345 S.C. 339, 348, 549 S.E.2d 243, 247 (2001)). And while we focus intently on a statute's text, the court may also consider context, particularly "[t]he history of the period in which the statute was passed . . . ." *In re Hosp. Pricing Litig.*, 377 S.C. at 54, 654 S.E.2d at 134.

History bears out a long and uniform recognition that, in spite of its title, the bank tax is not an "income tax," but is a franchise tax based on "financial income" instead of "taxable income."

As far back as 1948, an Attorney General's opinion explained the bank tax was a franchise tax and not an income tax. *See* Op. S.C. Att'y Gen. 294 (Mar. 12, 1948) ("[The bank tax] levies a tax upon . . . the entire net income of banks. [Including] all income from whatever source derived, even income from non-taxable securities. This is for the reason that the bank tax is a franchise tax for the privilege of operating . . . [in South Carolina], the amount thereof being measured by the entire net income."). The record in this case illustrates that this has been reiterated in various executive branch authorities over several decades. For example, as far back as 1967, regulations defined entire net income for purposes of the bank tax, S.C. Code Ann. Regs. 117-92.1 (1967), and, more recently, regulations that became effective in June 2003—ten years before Synovus's third amended tax return—expressly defined the bank tax as a franchise tax. S.C. Code Ann. Regs. 117-1500 (2003) ("Chapter 11 of Title 12 imposes a franchise tax on banks."). One of Synovus's witnesses even agreed that the bank tax is a franchise tax.

The 2003 regulations are particularly relevant to our analysis because the regulatory process requires an agency to "provide public notice of a drafting period where public comments can be accepted; conduct a public hearing on the proposed regulation; possibly prepare reports about the regulation's impact on the economy, environment, and public health; and submit the regulation to the Legislature for review, modification, and approval or rejection." *Joseph v. S.C. Dep't of Lab., Licensing & Regul.,* 417 S.C. 436, 454, 790 S.E.2d 763, 772 (2016) (citing S.C. Code Ann. §§ 1-23-110 to -160 (2005)). The court is required to presume that the 2003 regulations were duly enacted by the legislature. *See* S.C. Code Ann. § 1-23-60 (2005) ("The publication of a document filed in the office of the Legislative Council creates a rebuttable presumption: (1) That it was duly issued,

prescribed or promulgated subject to further action required under this article; (2) That it was filed and made available for public inspection . . . ; [and] (3) That the copy on file in the Legislative Council is a true copy of the original . . . ."). If we were to hold that the bank tax is not a franchise tax, we would effectively undo a regulation that is relatively longstanding, is facially valid, received the legislature's approval, and confirms the statute's established interpretation. We decline to do so.

If the immediately-above analysis were not enough, our resolution of this argument can be settled by evidence in the record that banks themselves have long understood the bank tax to be a franchise tax. The record before us contains testimony from a 2010 public hearing of the South Carolina Taxation Realignment Commission (the Commission). The General Assembly created the Commission to "review[] the adequacy, equity, and efficiency of the state's revenue structure" and report its findings and recommendations "with the goal of maintaining and enhancing the State as an optimum competitor in efforts to attract businesses and individuals to locate, live, work, and invest in the State . . . ." S.C. Code Ann. § 12-3-10(C)(1) (2014 & Supp. 2023). At the 2010 hearing, the then-President and CEO of the South Carolina Bankers Association explained, "In South Carolina, banks pay an income tax that is not calculated in the same manner as for a C Corporation. *The bank tax is a franchise tax*." He further explained:

> This income is 'book income' not 'taxable income' which is what C Corps are taxed on. As a result[,] all income and expenses are included in the tax calculation for a bank. And the entire net income is calculated without regard to the majority of the book/tax differences considered for federal income tax purposes, including the NOL [net operating loss] carryforward.

Though this testimony is not binding, it is further evidence of how the bank tax has historically been interpreted, *even by banks*.

We readily acknowledge the force of Synovus's argument that interpretation of entire net income should not waver depending on the statute. Certainly, if there were no interpretive history or historical understanding to reference, that argument might be powerful, if not prevailing. But we cannot pretend this history and historical understanding do not exist. Our interpretation of this history leads us to the conclusion that the bank tax is, and always has been, interpreted as a franchise tax, and "entire net income" is not interchangeable with "taxable income." Restraint and modesty advise the court to not upend these settled understandings without a strong

reason for doing so. We are convinced there is no such reason here, particularly when it is plainly evident that banks are not, and purposefully have not been, taxed in the same manner as other corporate entities.

**Conformity Between State and Federal Tax Law**

In 1985, the General Assembly began annually adopting federal income tax rules for the purpose of South Carolina's individual and corporate income taxes. Synovus argues that this "conformity" legislation applies to the bank tax and allows banks to use the net operating loss carryforward deduction. We respectfully disagree.

Our review of the relevant statutes leaves us convinced that the General Assembly never manifested any intention to conform the bank tax with the federal income tax regime. The initial conformity legislation from 1985 amended several tax statutes; it also explained that all of those changes related "to the Income Tax Act of 1926." Act No. 101, 1985 S.C. Acts 28-314 (effective for tax years after 1984). We reiterate that the bank tax is not a part of the Income Tax Act of 1926. The General Assembly removed the bank tax from that statutory scheme in 1937.

The 1995 conformity legislation "revis[ed], reorganize[ed], and recodif[ied]" several tax laws, but only those "imposing the individual and corporate income tax . . . ." Act No. 76, 1995 S.C. Acts § 1 (effective for tax years after 1995). That Act also created Chapter 6, better known as the "South Carolina Income Tax Act." *Id*. (creating S.C. Code Ann. §§ 12-6-10 to -5590). The 1995 amendments are the genesis of section 12-6-550, which, as previously described, excludes banks from the corporate tax otherwise imposed by Chapter 6. As before, the 1995 legislation did not modify the bank tax statutes.

Synovus relies heavily on the 2005 conformity legislation, arguing that the 2005 legislation adopted the federal tax code for all chapters of Title 12. Act No. 145, 2005 S.C. Acts § 8 (effective June 7, 2005) (amending S.C. Code Ann. § 12-6-50 and adopting the Internal Revenue Code "[f]or purposes of this title and all other titles which provide for taxes administered by the department"). Our first problem with this argument is facial. Synovus simply does not acknowledge that the relevant statutes—sections 12-6-40 and -50—were amended "to update the reference date by which this state adopts *various provisions* of the internal revenue code of 1986 and *clarify those provisions not adopted*[.]" Act No. 145, 2005 S.C. Acts § 8 (effective June 7, 2005) (emphases added). The General Assembly was not adopting the entire federal income tax code when it clarified that the state was "adopt[ing] various

provisions of the internal revenue code and clarify[ing] those provisions not adopted." *Id.*

More fundamentally, the structure of the 2005 amendments excludes reference to the bank tax statute altogether. It is true the 2005 conformity legislation amended the South Carolina Income Tax Act (not the bank tax) as well as other statutory income tax regimes. *See* Act No. 145, 2005 S.C. Acts § 8 (referencing amendments to S.C. Code Ann. §§ 12-6-40, -50, -1100, -1130, -1140, -2220, -3360, -3365, -3480, -4910, -5020, -5030; §§ 12-8-520, -1520; and § 12-10-105). The amendments then leapfrogged over the bank tax found in Chapter 11 and amended section 12-20-105 of the South Carolina Code. *Id.* (referencing amendments to corporate licensing tax credits). The General Assembly made no references to Chapter 11, or "the bank tax," when it had a clear opportunity to do so, and when it amended the surrounding statutes. In fact, the only reference to banks at all is found in the amendment to section 12-6-50, which articulates the sections of federal law specifically not adopted for South Carolina conformity purposes.

The 2005 amendment to section 12-6-50 excludes "[s]ections 581, 582, and 585 through 596 relating to the taxation of banking institutions . . . ." S.C. Code Ann. § 12-6-50(6) (2014). These excluded sections of federal law include the "Definition of [a] bank," 26 U.S.C.A. § 581 (West 1954); the "Bad debts, losses, and gains with respect to securities held by financial institutions," 26 U.S.C.A. § 582 (West 2004); the "Reserves for losses on loans of banks," 26 U.S.C.A. § 585 (West 1996); the "Deduction[s] for dividends paid on deposits," 26 U.S.C.A. § 591 (West 1981); the "Reserves for losses on loans," 26 U.S.C.A. § 593 (West 1997, 2013); and the "Alternative tax for mutual savings banks conducting life insurance business," 26 U.S.C.A. § 594 (West 2006).[1] Particularly relevant here, these sections of the federal code govern the calculation of income tax attributable to banking institutions. It stands to reason that by excluding these provisions, the General Assembly was aligning its adoption of federal law for income tax purposes with the fact that South Carolina taxes banks differently than it does other corporations.

In short, from the time the General Assembly began conforming the state income tax code with the federal tax code, it was evident that conformity did not apply to the bank tax or for bank tax purposes.

---

[1] Sections 583, 592, 595, and 596 have been repealed.

**GAAP and Constitutional Considerations**

GAAP is regulated by the Financial Accounting Standards Board. Synovus argues that DOR uses "book income," which is the balance of assets, equity, and liabilities calculated using a company's preferred accounting method and recorded on a business's financial statements, when determining a bank's entire net income, and that as a creature of GAAP, using book income to calculate entire net income for taxing purposes is an improper delegation of the state's taxing powers.

Prior to South Carolina conforming the individual and corporate income tax code with federal law, state law provided that a taxpayer should compute net income "in accordance with the method of accounting regularly employed" in keeping the taxpayer's books. *See, e.g.*, Code of Laws of S.C. § 65-281 (1962). The current code requires that taxpayers use the same method of accounting for state taxes as it does when it calculates its federal taxes. S.C. Code Ann. § 12-6-4420(A) (2014).

Synovus contends DOR has repeatedly looked to the income tax code for questions related to the bank tax and that entire net income does not have an established meaning to an accounting professional. In the context of whether the net operating loss carryforward is allowed, the record easily addresses both concerns. Expert testimony uniformly established that banks may use deductions for expenditures made during the current tax year because the established meaning of "net income" includes gross income minus expenses. The key difference for the carryforward is that a loss from a prior tax year is not an "expense" on the current year's balance sheet. Rather, the carryforward is "a deferred tax asset." Here, testimony established that a complete view of a company's financial situation would necessarily include deferred tax assets, but testimony also established that calculating a company's entire net income for the current tax year does not take account of losses realized in prior years.

There is no dispute that Synovus, on its own tax schedules produced in the record, indicated that it used GAAP accounting to calculate its South Carolina tax liability. Because Synovus is already utilizing GAAP for its own accounting, it would be illogical to find that the ALC's ruling—that Synovus's book income was equivalent to its net income calculated under GAAP—was arbitrary, capricious, or legal error. We find no such error from the ALC's order and we agree that a bank can easily indicate on its balance sheets that a net operating loss carryforward is not recognized in a particular jurisdiction, like it is not recognized here.

Furthermore, the statute's breadth recognizes the General Assembly's awareness that there are various accepted accounting methods that businesses routinely employ. We presume the General Assembly knew that federal law requires certain businesses to utilize particular accounting methods, as federal law does for banks like Synovus. *Williams v. Gov't Emps. Ins. Co. (GEICO)*, 409 S.C. 586, 602, 762 S.E.2d 705, 714 (2014) ("The General Assembly is presumed to know the law[.]"). That requirement is a function of federal law, however, and we are not aware of any authority suggesting that requiring uniformity in accounting methods between state and federal tax filings creates a constitutional infirmity.

**CONCLUSION**

Given the foregoing analysis, the order of the ALC is

**AFFIRMED.**

**GEATHERS and VINSON, JJ., concur.**